STEVEN G. KALAR
Federal Public Defender
Northern District of California
CANDIS MITCHELL
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:    (415) 436-7700
Facsimile:    (415) 436-7706
Email:        Candis_Mitchell@fd.org

Counsel for Defendant Acosta

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **United States of America**, | Case No.: CR 19–648 SI |
| Plaintiff, | **Sentencing Memorandum** |
| v. | Hearing Date:   May 15, 2020 |
| **Carlos Acosta,** | Hearing Time:   1:30 p.m. |
| Defendant. | |

INTRODUCTION

Defendant Carlos Acosta, through undersigned counsel, respectfully offers the following memorandum in support of his request for a 16-month sentence of imprisonment—the least counsel can ask for according to the terms of the plea agreement.

A below-Guidelines sentence is appropriate for the following reasons: (1) the § 3553(a) factors militate in favor of a substantially reduced sentence; (2) Mr. Acosta will have additional custodial time following his criminal case as he awaits deportation to Honduras; and, (3) to reduce the increased risk of catastrophic infection of Coronavirus Disease 2019 (COVID-19) given the combination of poor health care and confined conditions at Santa Rita Jail and the Bureau of Prisons

(BOP).

SECTION 3553(A) ANALYSIS

1. **The Nature and Circumstances of the Offense**

On October 23, 2019, Mr. Acosta was approached by an undercover police officer looking to buy drugs. PSR ¶ 6. The officer asked for $20 worth of crack. PSR ¶ 8. Mr. Acosta was arrested without incident shortly afterwards along with Harry Robleo—who was holding some of the drugs that Mr. Acosta was selling. When Mr. Acosta was searched he was found with bindles of crack, cocaine, methamphetamine, and heroin packaged for individual sale—the sum totals of the weight of bindles was equivalent to approximately seven quarters.[1]

2. **The History and Characteristics of the Defendant**

Born and raised in Honduras for most of his life, Mr. Acosta experienced a level of poverty not typically seen in the modern era in the United States. Living in a one-room shack with six of his nine other siblings, their home lacked both electricity and running water. He grew up with neither a steady source of sufficient food or the ability to wear needed clothing. His days were spent shoeless and eating mostly what families could grow and share in his small village. To this day, Mr. Acosta has never met his father—as he had another family and never lived with him—and he and his siblings grew up knowing that it was their burden to become financially independent and work to support their mother and themselves.

Because he left school when he was nine, he has a limited ability to read or write well in either Spanish or English. After leaving school, he began doing any work he possibly could to help support his family—including toiling long hours in agricultural fields and helping his mother at the fruit and vegetables stand she operated.

It is little wonder that before he reached adulthood, and after he became a father himself, Mr. Acosta found himself atop a train slowly travelling from Honduras through Central America to Mexico and then eventually on foot to cross the border into the United States.

//

---

[1] The *America the Beautiful* series quarters, which began to enter circulation in 2017, weigh 5.670 g each. Mr. Acosta had approximately 39 grams of drugs—with packaging.

SENTENCING MEMORANDUM
*ACOSTA*, CR 19–648 SI

2



**Image 1.** Migrants arrive at a rest stop in Ixtepec, Mexico, after a 15-hour ride atop a freight train headed north toward the U.S. border on Aug. 4. Thousands of migrants ride atop the trains, known as *La Bestia,* or The Beast, during their long and perilous journey through Mexico to the U.S.[2]

Whether caused by gangs, an ineffective government, drug trafficking, or poverty, Honduras currently claims the title of "murder capital of the world."[3] The government suffers from corruption and has lost international funding after allegations of human rights abuse.[4] There are also allegations of gang infiltration of their police force.[5] "According to the State Department, 42 percent of all cocaine headed to the U.S. and 90 percent of all cocaine flights now travel through Honduras."[6] In short, the country is hard on its citizens and harder still on people like Mr. Acosta who lack the education or money to change his place in the world.

---

[2] *John Moore/Getty Images.* Taken from Sayre, Wilson, "Riding 'The Beast' Across Mexico To The U.S. Border" Parallels (June 4, 2014). Accessed at: https://www.npr.org/sections/parallels/2014/06/05/318905712/riding-the-beast-across-mexico-to-the-us-border

[3] United States Department of State Bureau of Diplomatic Security. Honduras 2018 Crimes and Safety Report, (April 3, 2018). Accessed at:
https://www.osac.gov/Pages/ContentReportDetails.aspx?cid=23798

[4] Khan, Carrie, "Honduras Claims Unwanted Title of World's Murder Capital" Parallels (June 12, 2013). Accessed at: https://www.npr.org/sections/parallels/2013/06/13/190683502/honduras-claimsunwanted-title-of-worlds-murder-capital

[5] *Id.*

[6] *Id.*

SENTENCING MEMORANDUM
*ACOSTA*, CR 19–648 SI

He took the chance and travelled, eventually ending up Northern California. After he arrived, he initially worked intermittently as a day laborer. While working, some friends that he knew told him that he could make some easy money selling drugs. He agreed to do so because it greatly increased the funds he had to support his family in Honduras.

3. **The Need for the Sentence Imposed To Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense; To Afford Adequate Deterrence**

Considering the small amounts of drugs involved in the case, a below guidelines custodial sentence is appropriate in light of the totality of the circumstances and, thus, reflects the seriousness of the offense, promotes respect for the law, provides just punishment for the offense, and serves as an adequate deterrence to criminal conduct.

4. **The Need for the Sentence Imposed To Protect the Public from Further Crimes of the Defendant; and**

Mr. Acosta will be deported following the conclusion of his sentence and it is unlikely that the he will repeat his actions in the future—especially as onerous as his time in custody has been because of the additional steps that Santa Rita has been taking to prevent the spread of COVID-19 among inmates. He has no significant criminal history and the public faces little risk of harm from further crimes once he is deported.

5. **The Need for the Sentence Imposed To Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner**

Mr. Acosta has yet to complete an elementary education and speaks primarily Spanish. It is unlikely that any sentence would legitimately provide him sufficient time in custody for him to acquire language skills that would permit him to attain a high school education or complete vocational training while in custody—especially in light of the reductions of inmate movements accompanying the preventative measures to prevent the spread of COVID-19.[7]

As of May 8, 2020, the new strain of coronavirus that causes COVID-19, has infected over 3,926,724 people, leading to at least 273,852 deaths worldwide.[8] On March 11, the World Health

---

[7] https://www.bop.gov/coronavirus/covid19_status.jsp
[8] According to the Coronavirus Resource Center as tracked by the Johns Hopkins University of Medicine. Accessed at http://coronavirus.jhu.edu.

SENTENCING MEMORANDUM
*ACOSTA*, CR 19–648 SI

Organization officially classified COVIC-19 as a pandemic.[9] Governor Newsom declared a State of Emergency and all six Bay Area counties are currently under a shelter in place order. The numbers of infected individuals are rising exponentially. With confirmed cases in San Francisco and the entire Bay Area that indicate community spread, every necessary action is being taken to protect vulnerable populations and the community at large.

Conditions of custodial confinement create the ideal environment for the transmission of contagious disease.[10] An opinion piece in the New York Times describes these unique and pressing issues.[11] Inmates cycle in and out of detention facilities from all over the county, and people who work in the facilities including correctional officers, and care and service providers leave and return daily, without screening. Incarcerated people generally have poorer health than the general population, and even at the best of times, medical care in custody is (at best) limited.[12] Many people who are incarcerated also have chronic conditions, like diabetes or HIV, which makes them vulnerable to severe forms of COVID-19. According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[13]

Outbreaks of the flu regularly occur in jails and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases.[14] Secretary of State Mike Pompeo has called for Iran to release Americans detained there because of the "deeply troubling" "[r]eports that COVID-19 has spread to Iranian prisons," noting that "[t]heir detention amid increasingly deteriorating conditions

---

[9] *WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (March 11, 2020) *at* https://bit.ly/2W8dwpS.
[10] Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, *at* https://doi.org/10.1086/521910.
[11] *Our Courts and Jails Are Putting Lives at Risk*, Emily Bazelon, New York Times, March 13, 2020, available at https://www.nytimes.com/2020/03/13/opinion/coronavirus-courts-jails.html?searchResultPosition=1.
[12] Laura M. Maruschak et al. (2015). Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12. NCJ 248491. Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, *at* https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf
[13] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), *at* https://bit.ly/2W9V6oS.
[14] *Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020) *at* https://bit.ly/2TNcNZY.

defies basic human decency."[15] Courts across Iran have granted 54,000 inmates furlough as part of the measures to contain coronavirus across the country.[16] In the U.S., steps are already being taken in some jurisdictions to facilitate the release of elderly and sick prisoners and to reduce jail populations by discouraging the refusing the admission of individuals arrested on non-violent misdemeanor charges.[17]

At Santa Rita jail there have been weeks of flu outbreaks, with different units being quarantined on a regular basis and yet infections continuing to spread. Inmates are in tight quarters, even more so with the closure of North County jail. Access to personal hygiene items is limited with only those inmates that have certain means able to purchase commissary (better/more soap and other hygiene items). Additionally, the jail has now restricted all visits to the jail and only allows attorney visits. No family, friends or even experts are allowed into the jail.

Even the BOP is greatly impacted by COVID. Inmates are not being transferred from local facilities to BOP facilities—meaning that Mr. Acosta will have to spend even more time in local custody at Santa Rita and may not be transported to a BOP facility for months.[18] Additionally, recent test results show that the efforts to reduce inmate movement as well as reduction of programming has yet to contain the spread of COVID among the incarcerated. If anything, the most recent results reveal that the number of positive inmates in BOP custody has skyrocketed.

//

---

[15] Jennifer Hansler and Kylie Atwood, *Pompeo calls for humanitarian release of wrongfully detained Americans in Iran amid coronavirus outbreak*, CNN (Mar. 10, 2020) at https://cnn.it/2W4OpV7.
[16] Claudia Lauer and Colleen Long, *US Prisons, Jails On Alert for Spread of Coronavirus*, The Associated Press (Mar. 7, 2020) at https://apnews.com/af98b0a38aaabedbcb059092db356697.
[17] In New York Brooklyn District Attorney Eric Gonzalez, joined by public health experts, has asked Governor Cuomo to grant emergency clemencies to elderly and sick prisoners (Sarah Lustbader, *Coronavirus: Sentenced to COVID-19*, The Daily Appeal (Mar. 12, 2020) at https://theappeal.org/sentenced-to-covid-19/.); Cuyahoga County (Ohio) is holding mass pleas and bail hearings to reduce the current jail population (https://www.cleveland.com/court-justice/2020/03/cuyahoga-county-officials-will-hold-mass-plea-hearings-to-reduce-jail-population-over-coronavirus-concerns.html); Mahoning County (Ohio) jail is refusing all non-violent misdemeanor arrestees (https://www.wkbn.com/news/coronavirus/mahoning-county-jail-refusing-some-inmates-due-to-coronavirus-outbreak/); see also Collin County (TX) (https://www.dallasnews.com/news/public-health/2020/03/12/facing-coronavirus-concerns-collin-county-sheriff-asks-police-not-to-bring-petty-criminals-to-jail/);
[18] https://www.bop.gov/coronavirus/covid19_status.jsp

SENTENCING MEMORANDUM
*ACOSTA*, CR 19–648 SI



**Image 2.** Chart comparing the rate of infection at Santa Rita to other communities by comparison of the total numbers of positive tests recorded per 1,000 people.

Put simply, in light of this pandemic there is no need for Mr. Acosta to remain in custody for any longer than necessary where he faces greater risks to his physical health.

6. **The Kind of Sentences Available**

Here, the Court may impose any sentence up to 20 years' imprisonment, life-time supervised release, a $1,000,000 fine, and a $100 special assessment. A minimum term of three-years' supervised release is required.

7. **The Sentencing Range Established for the Applicable Category of Offense Committed by the Applicable Category of Defendant as Set Forth in the Guidelines**

   A. **Mr. Acosta's Proposed Guideline Calculations**

   Base Offense Level, USSG § 2D1.1(c)(10)..............................................20
   Acceptance of Responsibility, USSG § 3E1.1(a) & (b) ........................−3

   Total Offense Level ................................................................................. 17
   Criminal History Category ................................................................... III
   Sentencing Guideline Range.......................................................... 30-37
   Mr. Acosta's Recommendation ...............................................16 months

**B.     The Court Should Adjust Downward Three Levels for Acceptance of Responsibility**

Pursuant to U.S.S.G. § 3E1.1, the Court should depart three-levels because Mr. Acosta accepted responsibility for his involvement in the present offense as demonstrated by his guilty plea and his truthful admission of the conduct comprising the offense.

**8.     Any Pertinent Policy Statement**

While Mr. Acosta would generally encourage the Court to not impose supervised release for individuals like Mr. Acosta who will deported after the conclusion of their sentence, he recognizes that supervision is required to be imposed as a consequence of his conviction.

**9.     Unwarranted Sentencing Disparity**

While the requested sentence is a departure from the guideline range, the departure is *de minimis* when considering the conduct and the additional time Mr. Acosta will spend in immigration custody prior to his deportation. Additionally, a below-Guideline sentence is in accord with similarly situated defendants engaged in similar conduct swept up in the Tenderloin Drug initiative.

The table below summarizes the sentences received in a number of cases with individuals facing similar charges to Mr. Acosta and arrested as part of the same initiative. As the table shows, many had prior convictions for illegal re-entry and previous convictions for prior drug sales—just like Mr. Acosta—and all received below-Guideline sentences.

| Name | Case No. | Drug | Sale Amt. | CHC | USSG Range | Sentence | Priors |
|---|---|---|---|---|---|---|---|
| Wilson Acosta-Valle | 19-560-VC | Crack, heroin |  | II | 8-14 | 111 days | Federal drug case |
| Santos Aguilar | 19-454-VC | Heroin, meth | $20 | II | 15-21 | 152 days | Illegal reentry |
| Brayan Arteaga | 19-426-WHO | Crack | $16 | II | 8-14 | 37 days | |
| Wilfredo Cabrera | 19-452-WHO | Heroin | $17 | II | 8-14 | 132 days | 4 year drug sentence; 6 deports |
| Welbur Cardona-Navarro | 19-541-WHO | Heroin, crack | $20 | III | 24-30 | 12 months + 1 day | 2 illegal entries |
| Yerlyn Cruz-Ortiz | 19-453-SI | Crack | $16 | V | 21-27 | 15 months | On supervised release for illegal reentry |

| Ronny Dixson | 19-527-WHO | Heroin | | III | 18-24 | 12 months + 1 day | 8 drug felonies, including sales |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Jesus Flores | 19-429-SI | Cocaine, heroin, meth | $15 | I | 10-16 | 118 days | 2 deports |
| David Lopez Mejia | 19-661-VC | Crack | $20 | III | 15-21 | 125 days | 2 drug sales |
| Ismael Martinez | 19-650-RS | Crack, meth | | I | 0-6 | 48 days | |
| David Medina-Guerrero | 20-26-RS | Crack | $20 | III | 10-16 | 83 days | |
| Pedro Muncia | 19-428-CRB | Heroin, crack, meth | $20 | II | 8-14 | 126 days | Federal drug case, deport |
| Jose Ramos-Varela | 19-713-EMC | Meth | $20 | I | 10-16 | 57 days | |
| Anival Ramos-Velasquez | 19-503-EMC | Heroin, crack | $20 | I | 6-12 | 111 days | |
| Aaron Servellon | 19-689-RS | Crack, heroin, meth, fentanyl | $25 | I | 12-18 | 102 days | |
| Ristir Trejo | 19-535-RS | Fentanyl, crack, heroin | $20 | II | 21-27 | 140 days | |
| Luis Vargas-Valle | 19-386-RS | Crack | $21 | II | 8-14 | 6 months | 32 month illegal reentry sentence |
| Kelier Velasquez-Jossel | 19-483-EMC | Crack | $16 | I | 6-12 | 125 days | |
| Marco Velasquez-Trinidad | 19-456-WHO | Crack | $17 | I | 6-12 | 120 days | |
| Corey Wyatt | 19-396-RS | Alprazolam | $20 | VI | 6-12 | 99 days | Involuntary manslaughter, assault with deadly weapon |

Here, Mr. Acosta had a limited function and extremely limited involvement—he was a street level dealer. He had no ability to dictate the price or terms of the sale. He went and picked up his wares and sold it and made very little money a day—approximately $100. He was not responsible for packaging, delivering, or controlling what he sold. He should be sentenced accordingly.

**10. Restitution**

There is no need for an order of restitution in this case.

//

//

//

SENTENCING MEMORANDUM
*ACOSTA*, CR 19–648 SI

9

CONCLUSION

The facts before the Court establish compelling reasons to impose a sentence below the guideline range. Bound by the terms of the plea agreement, Mr. Acosta requests that the court sentence him to 16 months custody.

Dated:    May 8, 2020                              Respectfully submitted,

                                                   STEVEN G. KALAR
                                                   Federal Public Defender
                                                   Northern District of California

                                                              /S
                                                   CANDIS MITCHELL
                                                   Assistant Federal Public Defender